U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 FEB 25 PM 1:47

CLERK
BY_____(M)_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:21-cr-00022 |
| ) | |
| LOREN SENNA, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**
(Doc. 31)

Pending before the court is Defendant Loren Senna's motion to suppress "any evidence seized and any statements made subsequent to a[n] unwarranted search of a white Dodge Ram truck with Vermont registration number 402A721 in the evening hours of March 19, 2021 in South Burlington." (Doc. 31 at 1.) Defendant argues that the motor vehicle stop violated the Fourth Amendment because it was not supported by reasonable suspicion or probable cause.

On January 3, 2022 and January 14, 2022, the court held an evidentiary hearing at which Sergeant Michael Beliveau and Detective Chase Vivori from the Burlington Police Department ("BPD") and Dale Crispin, formerly a detective for the South Burlington Police Department ("SBPD"), testified. Defendant and the government filed post-hearing submissions on January 28, 2022, at which time the court took the pending motion under advisement.

Defendant is charged in a three-count Superseding Indictment with knowingly and intentionally possessing with the intent to distribute cocaine base, a Schedule II controlled substance ("Count I"); being a felon in possession of firearms ("Count II"); and knowingly possessing a firearm in furtherance of a drug trafficking crime for which he may be prosecuted in federal court ("Count III").

The government is represented by Assistant United States Attorney Nicole P. Cate. Defendant is represented by Karen R. Shingler, Esq.

## I. Findings of Fact.

Shortly before 6:30 p.m. on March 19, 2021, BPD received reports of gunshots in the area of Murray Street and Allen Street in Burlington, Vermont. The location of the shooting was a densely populated residential area. BPD officers responded and spoke to witnesses, who reported hearing gunshots from a white Jeep Cherokee that was chasing a silver Infiniti sedan. Officers found numerous rifle bullet casings that appeared to be for a 5.56-millimeter caliber weapon[1] on the road. Detective Vivori spoke with a witness at the scene, who described the white Jeep's driver hanging out of the driver's side window firing a rifle with one hand while continuing to drive. BPD officers used their radio to announce they had found bullet casings and the suspect was in a white Jeep Cherokee.

At approximately 6:31 p.m., BPD advised through dispatch that someone had reported a vehicle's mirror struck by a speeding vehicle in the area of Pearl Street and North Winooski Avenue. BPD Officers Wilson and Huynh responded in separate police cruisers to this location and saw a white Jeep turn into the VFW parking lot at approximately 6:35 p.m. The parking lot has two entrances on South Winooski Avenue. Officer Huynh drove into the north entrance with his cruiser's lights activated and identified the operator of the white Jeep as a white male with dark facial hair wearing what appeared to be a dark-colored hat.

The white Jeep reversed away from Officer Huynh toward the south entrance of the VFW parking lot. Officer Wilson pulled into the south entrance with his cruiser's lights activated and attempted to block the white Jeep's exit. The white Jeep crashed into the front driver's side of Officer Wilson's cruiser, rendering it disabled. Officer Wilson announced over the BPD radio that the white Jeep had crashed into him and was fleeing south on South Winooski Avenue.

---

[1] Sergeant Beliveau credibly testified that 5.56-millimeter rounds are more powerful than average handgun rounds.

Officer Huynh attempted to pursue the white Jeep with his cruiser's lights and sirens activated, but the white Jeep did not stop. Officer Huynh saw it head southbound on South Winooski Avenue, turn west on Maple Street, south on Church Street, west on Adams Street, south on St. Paul Street, and then into Pine Place. At this point, he lost sight of it. At approximately 6:40 p.m., Officer Huynh relayed over the radio that the driver was a white male with a beard.

At approximately 6:40 p.m., BPD issued the following "Be on the Lookout" ("BOL") alert to Chittenden County law enforcement:

> BOL FOR WHITE JEEP CHEROKEE OPERATED BY A WHITE MALE WITH A BEARD. MALE AND VEHICLE WERE JUST INVOLVED IN A SHOOTING IN BURLINGTON. WITNESSES SAID THE OCCUPANT OF THE JEEP WAS SHOOTING AT A SILVER INFINITI. 10-0 [USE CAUTION] THE GUN INVOLVED HAS NOT BEEN LOCATED. IF WHITE JEEP AND OCCUPANT IS LOCATED STOP, 95 [TAKE INTO CUSTODY], NOTIFY AGENCY [BPD].

(Gov. Ex. 26) (alterations in original). Shortly thereafter, the BPD updated its BOL to note that the Jeep had "damage to the driver's side front quarter panel" and "possibly has a flat tire." *Id.*

At approximately 6:57 p.m., BPD dispatch received a call from Matt Lessard, who lived in Decker Towers at 230 St. Paul Street, and reported both seeing the police chase of the white Jeep and seeing the same white Jeep parked at Decker Towers the previous night. Because he found the vehicle suspicious, he noted its license place as Vermont registration HRB608.

In the VFW parking lot, Officer Huynh found a silver side panel with "Commander" written on it. Commanders and Cherokees are similar Jeep sport utility vehicle models, although Sergeant Beliveau credibly testified that Cherokees are more common in the Burlington area. Officer Huynh returned to the area where he had last seen the white Jeep and spoke with a railroad employee, who reported that he had seen a male leaving the area on foot. On BPD radio at approximately 7:30 p.m., Officer Huynh reported a railroad employee had seen a male in dark clothes with a black backpack cross the railroad tracks and head toward the bike path.

At approximately 7:36 p.m., after the same railroad employee pointed it out, Officer Huynh found an unoccupied white Jeep Commander with Vermont registration HRB608 (the "Jeep") and front driver's side damage in the parking lot of the Bobbin Mill Apartments at 234 South Champlain Street, approximately one mile from the scene of the shooting. A SBPD canine tracked the man who left the Jeep one mile south on the bike path before losing the man's scent. Officers determined that the Jeep was registered to Jeffrey Schindler of 1 Forest Street, South Burlington, Vermont.

BPD requested SBPD Detective Crispin assist BPD by traveling to 1 Forest Street. At approximately 7:41 p.m. Detective Crispin arrived at this address but did not see the Jeep there and left. He knew from prior police encounters that Matthew Corbitt lived at 10 Forest Street close to Mr. Schindler's residence. At approximately 8:18 p.m., BPD Officer Byrne reviewed security camera footage from the Bobbin Mills Apartments and observed the suspect leaving the Jeep at approximately 6:37 p.m. Officer Byrne relayed over the radio that the video footage revealed the suspect was a white male wearing a black jacket and blue jeans and carrying a bag in his hands. Officer Byrne told Detective Vivori the suspect was also wearing a gray flat-brim baseball hat. This matched the description provided by Officer Huynh.

BPD Officer Kirby checked BPD's records system and learned that Mr. Schindler's "known associates" included Mr. Corbitt and that Mr. Corbitt had been arrested for a DUI in December 2020 while driving Mr. Schindler's Audi. Officer Kirby checked the records system for a photo of Mr. Corbitt and saw that his appearance was consistent with the description of the Jeep's operator. Detective Vivori found a photograph from Mr. Corbitt's Facebook profile which showed a white male with a mustache and goatee wearing a grey flat-brim style baseball hat. Because this photo generally matched the description of the shooting suspect and because he was a known associate of the Jeep's registered owner, BPD determined that Mr. Corbitt was a person of interest. Because Mr. Schindler's appearance did not match that of the shooting suspect, he was ruled out as a person of interest.

4

SBPD Detective Crispin returned to the area of 1 Forest Street, checked his records system, and also discovered the association between Mr. Schindler and Mr. Corbitt. Detective Crispin was familiar with Mr. Corbitt because he had previously arrested him. At the time, he was aware that the BPD considered Mr. Corbitt a person of interest in the shooting. He began watching both 1 and 10 Forest Street and, at approximately 8:40 p.m., saw a white Dodge Ram truck (the "Truck") pull into the driveway of 10 Forest Street. He observed the operator get out of the Truck, go inside the residence, and saw the lights inside the residence illuminated. Detective Crispin could see a male in the Truck's passenger seat who was holding a cellphone. From the limited light provided by the cellphone's display, Detective Crispin believed the man's build and stature generally matched those of Mr. Corbitt, but he could not make a positive identification.

Detective Crispin used his cellphone to communicate with BPD Detective Vivori and Sergeant Beliveau while surveilling Forest Street and relayed his observations. Detective Vivori told Detective Crispin to follow the Truck if it left the Corbitt residence. After a short stop inside 10 Forest Street, a man exited the residence, got into the Truck, and began to drive away. Detective Crispin followed the Truck and observed it speed up, slow down, and tap on its brakes, which Detective Crispin found unusual and indicative of an operator who was driving "indecisively" and uncertain of where he was going. The street in question had speed bumps, but Detective Crispin credibly testified that he did not believe speed bumps were the cause of the Truck's erratic driving. Based on his law enforcement experience, he believed the occupants knew they were being followed and were preparing to either speed away or stop and flee the Truck. He used his SBPD radio to advise that the Truck was "trying to ditch me" and "definitely trying to get rid of me." (Gov. Ex. F., 8:53 p.m. SBPD Radio Traffic.) Detective Vivori credibly testified that Detective Crispin "began giving us updates that the vehicle appeared to be driving in an erratic fashion, that he thought they were attempting to evade or elude him, and he relayed to us that he didn't think he would be able to continue following the vehicle for very long." (Tr. at 151, Lns. 16-20.)

5

Detective Vivori and Sergeant Beliveau asked Detective Crispin to stop the Truck. Because Detective Crispin was in an unmarked cruiser, a marked SBPD cruiser operated by Officers Dince and Lamay was called to assist. Officers Dince and Lamay activated their cruiser's lights and sirens. In response, after a minor delay, the Truck pulled over on Barber Terrace near White Street in South Burlington, in a residential area. The SBPD conducted a high-risk felony stop, in which the officers do not approach the stopped vehicle because of safety concerns.

In an elevated voice, Officer Dince commanded the operator and passenger of the Truck to show their hands out the windows. When they did not immediately comply, Officer Dince used a public address system to reiterate the order. Approximately one minute and twenty seconds after Officer Dince's first order, Defendant, who was driving, put his hands out of the window. Mr. Corbitt, who was the passenger, attempted to open the passenger door, was told to stay in the vehicle, and put his hands out the window. As instructed by the officers, Defendant exited the Truck first and walked backwards toward them with his hands above his head. When he reached the officers, he was directed to get on to his knees, cross his ankles, and put his hands on his head, and he did so. He was then handcuffed.

Mr. Corbitt was directed to follow the same procedure and did so. Detective Crispin testified that he considered both Defendant and Mr. Corbitt in custody at this time.

Once Defendant and Mr. Corbitt were handcuffed, officers approached the Truck, which had its driver's side door open, to ensure that it was safe. Approximately three minutes after Defendant was handcuffed, Detective Crispin and other officers saw in plain view on the Truck's driver's side floor clear plastic bags containing a white substance consistent with cocaine base. Defendant was searched, and $5,812 cash as well as a 9-millimeter bullet were found on his person. Defendant was asked if there were firearms in the Truck and indicated there might be one.

Defendant was read his *Miranda* warnings approximately eleven minutes after the Truck was pulled over, seven minutes after he was placed in handcuffs, and four minutes

6

after police discovered the suspected cocaine base in the Truck. He was asked if the gun in the Truck was a handgun. He responded, "handgun." (Gov. Ex. 17 at 11:49-11:54.)

At 5:34 a.m. the following morning, BPD Detective Stoughton obtained a state court search warrant for the Truck, which was executed shortly thereafter.

## II. Conclusions of Law and Analysis.

### A. Whether Evidence Seized From the Truck Must Be Suppressed.

Defendant argues the stop of the Truck was a seizure of his person unsupported by reasonable suspicion or probable cause and that the fruits of that seizure must be suppressed. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. Amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996).

"[T]he Fourth Amendment requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States v. Wilson*, 699 F.3d 235, 242 (2d Cir. 2012)) (internal quotation marks and citations omitted) (alteration in original). "[D]uring a traffic stop an officer seizes everyone in the vehicle." *Brendlin v. California*, 551 U.S. 249, 255 (2007) (alteration in original). For this reason, the driver or any passenger "may bring a Fourth Amendment challenge to the legality of a traffic stop." *Id.* at 259. In "evaluating the reasonableness of an investigative stop[,]" courts examine "'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

### 1. Whether the Initial Stop Was Supported by Reasonable Suspicion.

A stop must be justified at its inception. "Any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to

7

warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013). Reasonable suspicion requires "only facts sufficient to give rise to a reasonable suspicion that criminal activity 'may be afoot[.]'" *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *Terry*, 392 U.S. at 30). There must be "specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing[.]" *Id.* (internal quotation marks and citations omitted).

"Like probable cause, reasonable suspicion is determined based on the totality of the circumstances but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (quoting *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002)). In determining whether a reasonable suspicion exists, the court's inquiry is an objective one and "the subjective intentions or motives of the officer making the stop are irrelevant." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

At the time the Truck was pulled over, law enforcement knew that a white Jeep Commander[2] driven by a white male with a beard, dark clothing, jeans, and a gray flat-brim baseball cap had been involved in a shooting in a heavily populated residential area while chasing another vehicle. At least one witness described the operator as leaning out of the window and shooting a rifle with one hand while driving the Jeep. BPD officers knew that the Jeep had rammed a BPD cruiser while attempting to escape apprehension and had repeatedly failed to stop when pursued by a police cruiser with its lights and sirens activated. Law enforcement knew that the Jeep was registered to Jeffrey Schindler, who was Mr. Corbitt's neighbor. They also knew Mr. Corbitt had recently been arrested while driving Mr. Schindler's Audi. The two men were considered "known associates" in

---

[2] The unusual model of the Jeep rendered it more readily identifiable. *See United States v. Patterson*, __ F.4th __, 2022 WL 333248, at *2 n.7 (2d Cir. Feb. 4, 2022) (observing that evidence that only a small fraction of cars registered in Westchester County were black or gray Camaros or Challengers supported reasonable suspicion that the vehicle in question matched one involved in a menacing with a firearm crime under investigation).

a police database. *See Seifert v. Rivera*, 933 F. Supp. 2d 307, 321 (D. Conn. 2013) ("[S]ome courts have found detention sustainable . . . where the detainee is closely associated with a person suspected of committing a crime.") (collecting cases). Based on police records, Bobbin Mill surveillance footage, and a Facebook photo, BPD believed that Mr. Corbitt matched the description of the operator of the Jeep. *See United States v. Simmons*, 560 F.3d 98, 108 (2d Cir. 2009) (finding reasonable suspicion to stop an individual in part because his "appearance matched the description of the suspect").

SBPD Detective Crispin observed the Truck in Mr. Corbitt's driveway with a passenger whose build and stature matched Mr. Corbitt's. After a short stop at the Corbitt residence, the Truck left the area. At the time, law enforcement knew the Jeep had been abandoned and its operator was no longer in it. While following the Truck, Detective Crispin observed it to drive erratically and attempt to evade him. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) ("[E]rratic driving or obvious attempts to evade officers can support a reasonable suspicion."); *United States v. Weaver*, 9 F.4th 129, 147 (2d Cir. 2021) ("Unusual, evasive, or furtive behavior, especially in the presence of law enforcement, is often a critical factor in the reasonable suspicion analysis.").

Detective Vivori and Sergeant Beliveau asked SBPD to stop the Truck and to take precautions when doing so because of a concern that its occupants may be armed and dangerous. "An officer may rely on the request of another officer to stop a suspect, even if the stopping officer has not been told all of the information about the suspect known by the requesting officer." *United States v. Mack*, 2014 WL 7140604, at *9 (D. Vt. Dec. 12, 2014) (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985)).

> Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.

*United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001).

Based on the "totality of the circumstances[,]" *Elmore*, 482 F.3d at 179, there was

reasonable suspicion to believe that Mr. Corbitt was in the Truck and that he may have been involved in a shooting from a speeding vehicle in a densely populated residential area. Based on the temporal and geographic proximity of the shooting and the abandonment of the damaged Jeep by a white male resembling Mr. Corbitt who left on foot, law enforcement had reason to believe Mr. Corbitt was armed and dangerous. Because of the Jeep's deliberate damage to a police cruiser in an effort to avoid apprehension, law enforcement further knew that Mr. Corbitt may attempt to flee if a stop of the Truck was attempted.

The Second Circuit recently observed that "reasonable suspicion of armed criminal activity . . . strongly support[s] further investigation of persons who might have engaged in such activity and, as a result, might well be armed and dangerous." *United States v. Patterson*, __ F.4th __, 2022 WL 333248, at *7 (2d Cir. Feb. 4, 2022). At the time of the stop, Mr. Corbitt was the sole person of interest in a dangerous shooting incident that had occurred mere hours before. It would have been unreasonable for law enforcement to refrain from stopping the Truck when the shooter had already eluded them at least twice, was armed with a powerful weapon, and was at large. This remained true even though law enforcement did not believe the Truck was involved in the shooting and could not see its occupants. Although law enforcement could not be certain that Mr. Corbitt was in the Truck, a person who had just visited his residence clearly was. Because there was reasonable suspicion based on specific and articulate facts that the Truck's operator may be connected to a shooting, the stop of the Truck was "justified at its inception[.]" *Terry*, 392 U.S. at 20.

### 2. Whether the Stop Was Reasonable in Scope.

Because the initial stop was justified, the inquiry turns to "whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* "If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a *de facto* arrest that must be based on probable cause." *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992). "The

scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

The Supreme Court has recognized that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). For this reason, "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 412, 415 (1997); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977)) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."). In a case strikingly similar to the instant one, the Second Circuit has ruled:

> [W]hen circumstances provide a "reasonable basis" for an officer "to think that the person stopped poses a present physical threat to the officer or others[,]" *United States v. Newton*, 369 F.3d at 674[,] [t]hen, "the Fourth Amendment permits the officer to take 'necessary measures ... to neutralize the threat' without converting a reasonable stop into a *de facto* arrest." *Id.* (quoting *Terry v. Ohio*, 392 U.S. at 24). As the Supreme Court explained in *Terry*, when circumstances warranting an investigative stop pose a risk of danger, the court's concern is
>
>> with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.
>
> *Terry v. Ohio*, 392 U.S. at 23–24.
>
> This reasoning has informed numerous federal court decisions upholding "a range of restraints incident to a stop, from the pat-down at issue in *Terry*, to the drawing of firearms, to the use of handcuffs." *United States v. Newton*, 369 F.3d at 674 (internal citations omitted) (collecting cases across circuits). Indeed, such measures have been found reasonable "not 'to

11

>discover evidence of crime,' but to help law enforcement ascertain whether a suspect has a weapon 'which might be used to harm the officer or others nearby.'" *United States v. Weaver*, 9 F.4th at 140 (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)).

*Patterson*, 2022 WL 333248, at *11 (parallel citations and footnotes omitted).

For reasons analogous to those in *Patterson*, the officers conducting the stop of the Truck reasonably believed its occupants may be armed and dangerous. They also had reason to believe that its occupants would take considerable and unsafe measures to avoid apprehension. Because there was a reasonable suspicion that Mr. Corbitt "may be armed and presently dangerous[,]"*Bailey*, 743 F.3d at 332 (emphasis omitted) (quoting *Terry*, 392 U.S. at 30), the police officers conducting the stop lawfully took measures that were reasonable in a high-risk situation to minimize the potential of harm to officers and others. *See United States v. Barlin*, 686 F.2d 81, 87 (2d Cir. 1982) (upholding pat-down of woman who was with two men "whose involvement in an ongoing narcotics transaction seemed apparent"). Neither occupant of the Truck immediately complied with orders to show their hands, which increased the potential threat. *See Tracy v. Freshwater*, 623 F.3d 90, 97 (2d Cir. 2010) (holding "fail[ure] to comply with a direct order" can "necessitat[e] a forceful response" by arresting officers).

Because "suspects may injure police officers and others by virtue of their *access* to weapons, even though they may not themselves be armed[,]" officers were entitled to take steps to prevent Defendant and Mr. Corbitt from accessing the Truck during the stop. *Long*, 463 U.S. at 1048 (emphasis supplied). Although handcuffing is a "hallmark of a formal arrest[,]" it is permissible during an investigatory stop when "police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat." *United States v. Fiseku*, 915 F.3d 863, 871 (2d Cir. 2018) (internal quotation marks, citations, and footnote omitted); *see also Patterson*, 2022 WL 333248, at *15 n.24 ("For several decades, circuit courts have upheld as reasonable *Terry* stops during which police pointed guns at persons reasonably suspected of being armed and dangerous.") (collecting cases). In light of the seriousness of the crime under investigation and the potential for further

12

violence, handcuffing was the least intrusive means to ensure officer safety. *See Sharpe*, 470 U.S. at 687 ("The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.").

In *Patterson*, officers stopped a vehicle with their guns drawn based on a report that two black men driving a black or dark gray Camaro or Challenger had menaced a woman with a firearm in a nearby supermarket parking lot. 2022 WL 333248, at *7-*8. The officers stopping the vehicle could not see the occupants or even discern the number of them. Although the police lacked probable cause to arrest, the Second Circuit found it was reasonable for them to order the occupants out of the stopped vehicle at gunpoint and to handcuff them "to neutralize the threat without converting a reasonable stop into a *de facto* arrest." *Id.* at *11 (internal quotation marks and citations omitted). The Second Circuit further concluded

> the force used . . . —while undoubtedly strong—was reasonable to the armed crime under investigation and appropriate at least until such time as law enforcement authorities could determine whether the Camaro's occupants fit the description of the menacing assailants and, if they did, could take measures to ensure that the men could not employ a firearm reasonably suspected to be in their possession.

*Id.* at *10. This same conclusion is warranted here.

When the Truck's occupants exited, they left the driver's door open. Officers discovered what appeared to be illegal narcotics in plain view. At that point, the officers had probable cause to arrest. *See United States v. Heath*, 455 F.3d 52, 57 (2d Cir. 2006) (collecting cases where illegal narcotics in plain view gave officers probable cause to arrest). Law enforcement's belief that Defendant was in custody prior to this discovery does not alter that conclusion. A court must "assess the circumstances objectively, and not according to the subjective motivations of police officers, let alone what an officer's practice might be in other circumstances." *Fiseku*, 915 F.3d at 871 n.6 (citation omitted); *see also United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (holding defendant's argument that he was arrested "when he first came in contact with the police" as "officers

intended to arrest him at the outset" was "misplaced" because "officers' subjective intent does not calculate into the analysis of when [defendant] was arrested."); *Weaver*, 9 F.4th at 145 ("The Supreme Court has long rejected any attempt to inject subjectivity into the Fourth Amendment context.").

Because the stop of the Truck was justified at its inception and reasonable in scope and duration, it did not violate the Fourth Amendment. *Sharpe*, 470 U.S. at 682.

### B. Whether Defendant's Arrest Was Supported by Probable Cause.

After law enforcement discovered what appeared to be illegal narcotics in plain view, they had probable cause to arrest Defendant, who, minutes before, was seated where this incriminating evidence was found. Because of the seriousness of the shooting crime under investigation, the threat posed, and the evasive behavior of Defendant, "it is possible that [the police] could have arrested him based on the available information prior to finding the [illegal narcotics.]" *Vargas*, 369 F.3d at 102; *see Graham v. Connor*, 490 U.S. 386, 396 (1989) (holding "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" are relevant to probable cause determination). The court "need not decide that question because at the point of finding the [illegal narcotics], the police certainly had probable cause to arrest him." *Vargas*, 369 F.3d at 102.

After Defendant was handcuffed, officers searched him and found over $5,000 in currency and a bullet. The fruits of this search were "not necessary to support probable cause to arrest" and this search was permissible incident to Defendant's arrest. *Rawlings v. Kentucky*, 448 U.S. 98, 111, 111 n.6 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."). The discovery of the cash and bullet "was inevitable given the reasonableness of [Defendant's] continued detention up until his lawful arrest." *Bailey*, 743 F.3d at 339.

For the foregoing reasons, Defendant's arrest was supported by probable cause, and evidence seized incident to his arrest was not unlawfully obtained.

14

### C. Whether Defendant's Statements Must Be Suppressed.

While he was handcuffed but before he was arrested and given *Miranda* warnings, Defendant was questioned by law enforcement regarding whether there were firearms in the Truck. The Second Circuit "has specifically rejected Fourth Amendment reasonableness as the standard for resolving *Miranda* custody challenges[:] 'whether a "stop" was permissible under *Terry v. Ohio* is irrelevant to the *Miranda* analysis. *Terry* is an 'exception' to the Fourth Amendment probable cause requirement, not to the Fifth Amendment protections against self-incrimination.'" *Newton*, 369 F.3d at 673 (alterations adopted) (quoting *United States v. Ali*, 68 F.3d 1468, 1473 (2d Cir. 1995)); *see also Patterson*, 2022 WL 333248, at *13 n.19 (noting that "[c]ircumstances may bear differently in the Fifth Amendment context than in the Fourth Amendment context" and pointing out "that Fifth Amendment custody determination considers how circumstances appear to person being restrained while Fourth Amendment reasonableness determination considers how circumstances appear to officer").

"[H]andcuffing [Defendant], though reasonable to the officers' investigatory purpose under the Fourth Amendment, nevertheless placed him in custody for purposes of *Miranda*" because Defendant's "freedom of action [was] curtailed to a degree associated with formal arrest[.]" *Newton*, 369 F.3d at 677 (internal quotation marks and citations omitted). He was thus subjected to custodial interrogation without *Miranda* warnings, and his statement about whether there was a firearm in the Truck must be suppressed unless an exception applies.

The government argues Defendant's statement should not be suppressed because it falls under the public safety exception. *See New York v. Quarles*, 467 U.S. 649, 656, 658 (1984) (recognizing a "narrow exception to the *Miranda* rule" where police questioning is "reasonably prompted by a concern for the public safety"). To invoke the public safety exception, police must have "an objectively reasonable need to protect themselves from immediate danger" and their questions must be "narrow in scope, directly targeting the safety concern, and . . . not posed to elicit incriminating evidence." *United States v. Estrada*, 430 F.3d 606, 613 (2d Cir. 2005).

15

In this case, the police had handcuffed the Truck's occupants and secured the Truck itself before posing questions to Defendant about firearms. Because at the time "the suspect[s] and the surrounding area had been secured and any threat to the officer or to public safety eliminated prior to the unwarned questioning[,]" the public safety exception does not apply. *United States v. Reyes*, 353 F.3d 148, 153 (2d Cir. 2003) (citing, *inter alia*, *United States v. Raborn*, 872 F.2d 589, 595 (5th Cir. 1989) (holding public safety exception did not justify questioning of narcotics suspect about the location of a weapon in his vehicle, where police had already secured the vehicle)).

Defendant's motion to suppress the statement he made during custodial interrogation without *Miranda* warnings is therefore GRANTED.[3]

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress evidence (Doc. 31) is DENIED IN PART as to physical evidence and GRANTED IN PART as to statements made by Defendant prior to receiving *Miranda* warnings.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 25th day of February, 2022.

Christina Reiss, District Judge
United States District Court

---

[3] The parties have not addressed whether Defendant's post-warning statements were tainted by the prior *Miranda* violation. Because the pre-warning questioning of Defendant did not "evince[] a deliberate strategy of trying to elicit incriminating statements that [officers] could then use later to cross-examine the defendant after administering *Miranda* warnings," Defendant's post-warning statement is not automatically suppressed. *United States v. Williams*, 681 F.3d 35, 42 (2d Cir. 2012). For the post-warning statement, it is immaterial "whether the public safety exception actually excused th[e pre-warning] questioning." *Id.*